UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEITH MALLORY,                )
                                       )
          Plaintiff,         )
                                       )
       v.                    )      No.  4:13CV363RWS
                                       )              (TIA)
CAROLYN W. COLVIN,         )
COMMISSIONER OF SOCIAL SECURITY,   )
                                       )
         Defendant.      )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on an adverse ruling of the Social Security Administration. The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b). The suit involves an Application for Supplemental Security Income under Title XVI.

Claimant is proceeding in this cause without the assistance of retained counsel. Claimant's Complaint was filed on February 26, 2013. On March 6, 2013, the Court entered a Case Management Order setting out the briefing schedule to be followed in this cause in accordance with Rule 9.02 of the Local Rules of this Court. Defendant Commissioner of Social Security timely filed her Answer to Claimant's Complaint on May 6, 2013. On September 19, 2013, the undersigned ordered Claimant to inform the Court if he intended to pursue his claims based solely on the allegations made in his Complaint, or whether he wished to submit a Brief in Support of the Complaint. After Claimant failed to comply with the directives of the order, the undersigned entered an order on November 6, 2013, directing Claimant to file a Brief in Support of his Complaint or pleading stating he intends to pursue his claims solely on the allegations set forth in his Complaint.

On November 15, 2013, Claimant filed a pleading asking the Court to grant him full disability benefits inasmuch as the ALJ erred in his decision denying benefits.

## I.    Procedural History

On June 2, 2010, Claimant filed an application for Supplemental Security Income payments pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 120-23),[1] alleging a disability onset date of July 15, 2008, due to kidney cancer and heart valve leak. (Tr. 138). The application was denied, and Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 6, 73-76). Claimant testified and was represented by counsel. (Tr. 21-52). Vocational Expert Dr. Gerald D. Belchick, Ph.D., also testified at the hearing. (Tr. 52-63, 87-88). After a October 18, 2011 hearing, the ALJ issued a Decision on November 10, 2011, finding that Claimant was not disabled. (Tr. 7-17). On January 28, 2013, the Appeals Council denied Claimant's Request for Review. (Tr. 1-3). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.    Hearing on October 18, 2011

#### 1.    Claimant's Testimony

At the hearing on October 18, 2011, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 21-52). Claimant has never been married and has two children ages seventeen and eighteen. (Tr. 26-27). Claimant's date of birth is November 14, 1967 and at the time of the hearing, Claimant was forty-three. (Tr. 27). Claimant lives in an apartment with his retired

---

[1]Tr." refers to the page of the administrative record filed by the Defendant with his Answer (Docket No. 15/filed May 6, 2013).

mother. (Tr. 27). Claimant completed high school. (Tr. 28). He is right-handed. Claimant stands at five feet nine inches and weighs approximately 170 pounds. (Tr. 28). Claimant uses the computer at the apartment. (Tr. 29). He has a misdemeanor conviction in 1999 for phone harassment. (Tr. 29).

Claimant smokes, but he has cut down to one package of cigarettes every five days. (Tr. 42). He consumes two to three beers twice a week. (Tr. 42). His driver's license expired seven years earlier. (Tr. 43).

Claimant testified that he stopped working as a manager at K-Mart when he was terminated in 2001 after he failed to complete a special assignment given to him. (Tr. 30, 34). His duties included stocking shelves, maintaining inventory, and ordering for the store. (Tr. 31). Claimant supervised two to three employees, but he did not have the authority to hire and fire employees, only to write up an employee. (Tr. 32). He could recommend the hours his employees be scheduled, and he could determine their assignments. (Tr. 33). Prior to working at K-Mart, he worked as a stocker at Shop and Save in charge of stocking the liquor aisle. (Tr. 33). Claimant worked at Major Brands, a wholesale liquor store, stocking liquor, and as a forklift driver at Home Depot. (Tr. 37). Claimant last worked in 2007 in a temporary dishwashing job. (Tr. 38). Claimant testified from 2003 through 2006 he was looking for work. (Tr. 38). Claimant testified that he worked around his sister's house helping her refinish the home. (Tr. 39). Claimant last worked in 2007, because of health complications. (Tr. 30).

Claimant testified that kidney cancer surgery in July 2008, heart problems, breathing problems, and pain in his right side preclude him from working. (Tr. 39-40). He takes three medications for his heart problems, fluid retention medications, a potassium supplement, a medication

for GERD, and over-the-counter Motrin for pain. (Tr. 40-41). Although a doctor has prescribed medications to reduce his kidney level, Claimant testified that his kidney is in the same range of elevation. (Tr. 52). Although he had been prescribed Vicodin for back pain, he could not tolerate it. (Tr. 41, 49). His side effect from the water pills is frequent urination. (Tr. 41). Claimant testified that he has residual problems since his kidney surgery including elevated kidney level and swelling in the ankles. (Tr. 48). To alleviate the swelling, he lies down three times a day or elevates his legs. Claimant testified that he has to use the restroom once an hour. (Tr. 48). He experiences pain in his right side and lower back area. (Tr. 49).

Claimant experiences a lot of fatigue from hypertension, blood pressure, and the leaking heart valve. (Tr. 49). Surgery has been recommended to repair the valve and will be scheduled when his heart deteriorates. (Tr. 50).

Claimant testified that he tries to cook twice a week, helps with the dishes, does the laundry, irons clothes, and takes out the trash. (Tr. 43-44, 46). He has to carry the laundry down steps to a common area. (Tr. 44). Sometimes he walks to the grocery store two blocks from his apartment if he needs a couple of items, or his sister takes him. (Tr. 45). Claimant takes public transportation to his doctor's appointments. (Tr. 46).

Claimant testified that he could walk for fifteen to thirty minutes, stand for thirty minutes to one hour, sit for thirty minutes to one hour, and lift five to ten pounds. (Tr. 46-47). If moving constantly, he could stand for an hour or two. (Tr. 51).

### 2. Testimony of Vocational Expert

Vocational Expert Dr. Gerald Belchick, a retired vocational rehabilitation counselor and an expert witness for Social Security, testified in response to the ALJ's questions. (Tr. 52-63). Dr.

Belchick explained how St. Louis and fifty miles around the city would be the region of the country he would use as a reference concerning the existence and number of jobs. (Tr. 54). Dr. Belchick testified that Claimant's vocational history over the past fifteen years included two jobs. His sales job at K-Mart as a department manager, a semi-skilled job and considered light as generally performed within the national economy. (Tr. 54). After he was promoted to department manager at K-Mart, Dr. Belchick explained that the DOT classifies the job as a skilled occupation and still light but if he had to do some stocking, then the exertional level would be medium. (Tr. 55). Dr. Belchick opined that the forklift driver job would be a semi-skilled, medium exertional level job; the stocking jobs would be an unskilled, medium exertional job; and the dishwasher job would be an unskilled, light exertional job. (Tr. 55). Dr. Belchick noted how Claimant's manager skills would be used in other jobs if in the same field of managing. (Tr. 56).

The ALJ asked Dr. Belchick to assume as follows:

light work on the first hypothetical, with the following limitations: climbing ramps and stairs occasionally; never climb ropes, ladders, scaffolds; stoop, kneel, crouch, crawl occasionally; must avoid concentrated exposure to extreme cold, wetness, heat, humidity. Would that individual be able to perform any past work?

(Tr. 56). Dr. Belchick responded yes and cited the sales and department manager jobs. (Tr. 56).

Next, the ALJ asked Dr. Belchick to assume the same as hypothetical one, but he added a "sit-stand option at the work site with the ability to change positions frequently." (Tr. 56-57). Dr. Belchick responded such individual could perform the department manager job and perhaps even in sales as well as cashier II job including self service parking lot attendant, self service gas station attendant, toll collectors, ticket sellers in movie theaters, unskilled jobs with 11,000 jobs available in the St. Louis area and 987,000 available nationally. (Tr. 57-58).

In hypothetical three, the ALJ removed the sit-stand option and placed the level to sedentary and assumed there would no longer by any past work. (Tr. 59). Dr. Belchick noted such individual could work as a bench assembler, a light or medium level job and sedentary with 1,600 jobs in the St. Louis area and 240,000 jobs available nationally; and a packaging job at the sedentary level with 2,000 jobs in the St. Louis area and 315,000 available nationally. (Tr. 59).

The hearing record notes that Claimant left the hearing to take a short break. (Tr. 60).

In the fourth hypothetical, the ALJ asked Dr. Belchick to assume the same as hypothetical three, "but this individual, because of fatigue, during the duty day, would need three additional breaks beyond the normal two breaks and a lunch break, and when I say additional breaks, it would be at least 15 minutes." Dr. Belchick opined such individual would not be able to perform the jobs he cited in response to hypothetical three unless there was an accommodation made. (Tr. 61).

In response to counsel's question regarding whether a hypothetical individual's ability to perform jobs would be affected if the individual could sit for 30 minutes, stand for 30 minutes, and alternate sitting and standing, and required a bathroom break once an hour, Dr. Belchick responded yes. (Tr. 62). He explained an individual requiring unauthorized breaks during the work day would require an accommodation inasmuch as unauthorized breaks during the work day interferes with the flow of work and are unacceptable work practices. When asked whether one extra break unscheduled would require an accommodation, Dr. Belchick noted it depends on the length of the break. (Tr. 62). Dr. Belchick cited an individual who has to go to the restroom with frequency to be acceptable to employers so long as the worker does not interrupt the flow of work constantly. (Tr. 63).

### 3. Forms Completed by Claimant

An undated Physical Residual Functional Capacity Assessment ("PRFCA") form is included in the record. (Tr. 65-70). The PRFCA form states that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. (Tr. 66). In support, the disability examiner cited to the medical record. (Tr. 67). He prepares food three to four times a week. (Tr. 150). He goes out four to five times a week and either walks, uses public transportation, or rides in a car. (Tr. 151). He walks three to four times a week. (Tr. 152). The examiner noted Claimant can occasionally climb, stoop, or kneel. (Tr. 67). Claimant has no manipulative, visual, or communicative limitations. (Tr. 67-68). With respect to environmental limitations, the examiner found Claimant should avoid concentrated exposure to hazards, machinery, and heights due to heart problems and hypertension. (Tr. 69).

In the Disability Report - Adult, Claimant reported he stopped working on January 1, 2002 because he was terminated. (Tr. 138).

In the Function Work - Adult dated July 15, 2010, Claimant noted his daily activities to include showering, watching television, cooking, and walking. (Tr. 148).

## III. Medical Records and Other History

The November 2, 2006 echocardiography report showed sinus rhythm, concentric left ventricular hypertrophy with 60% ejection fraction, small pericardial effusion, mild aortic stenosis and moderate aortic insufficiency, and mild tricuspid insufficiency with mild pulmonary hypertension. (Tr. 206). Dr. Richard Whiting noted Claimant had been studied in the lab before and on March 29, 2006, he had a left ventricular hypertrophy with 70% ejection fraction. (Tr. 205).

The June 11, 2007 echocardiograms showed mild aortic stenosis, moderate aortic insufficiency, and left atrial enlargement. (Tr. 207-09).

On February 5, 2008, Dr. John Mellas evaluated Claimant for azotemia. (Tr. 212). Dr. Mellas noted how Claimant has longstanding severe hypertension associated with left ventricular hypertrophy and an acquired aortic insufficiency. Dr. Mellas noted Claimant also has chronic kidney disease with an elevated creatinine and right renal mass being evaluated at Barnes. Examination showed his blood pressure to be 180/100 with a pulse of 78. Cardiac examination revealed a hyperdynamic precordium with extremities showing trace of edema around his feet. Dr. Mellas found Claimant has longstanding severe essential hypertension associated with hypertensive heart disease and hypertensive nephrosclerosis. Dr. Mellas noted Claimant's medications are being adjusted by a doctor at Barnes. (Tr. 212).

The August 15, 2008 routine study showed kidney to be normal in size and echogenicity, a solid rounded mass in the midpole of the right kidney, and a few small left renal cysts but no stones or hydronephrosis noted. (Tr. 197-202). Dr. Lowdermilk recommended further evaluation with CT with IV contrast of abdomen and pelvis. (Tr. 202).

On August 18, 2008, Claimant had a consultation at St. Mary's Health Center for right pleural effusion with right lower lobe atelectasis. (Tr. 214). Claimant reported living at home and taking care of himself. (Tr. 215). Cardiac examination revealed a 4/6 systolic murmur and a 2/6 diastolic murmur. (Tr. 215).

The August 29, 2008 chest x-ray showed small pleural effusions and pulmonary vascular congestion. (Tr. 195-96).

In the December 2, 2008 letter, Dr. Mellas noted how Claimant returned for treatment after eleven months after the first encounter during which he was evaluated for severe hypertension, chronic kidney disease as a result of hypertension, and a renal mass. (Tr. 211). Claimant reported feeling well and denied shortness of breath or swelling. Examination showed his blood pressure to be 148/80 with his pulse being 75 and no edema of extremities observed. Dr. Mellas opined treatment to be tricky inasmuch as Claimant has advanced chronic kidney disease on the basis of longstanding and severe hypertension with some deterioration of kidney function both due to a decrease in renal mass and the progressive nature of his renal disease. Dr. Mellas continued his medications with the exception of the potassium supplement which he discontinued. (Tr. 211).

In the March 3, 2009 letter, Dr. John Mellas noted how Claimant returned for reevaluation of chronic kidney disease due to longstanding severe hypertension and partial nephrectomy performed at Barnes for renal cell cancer. (Tr. 210). Claimant reported feeling well of late and denied any shortness of breath or swelling. Examination showed his blood pressure to be elevated at 170/88 with his pulse being 84. Dr. Mellas opined that Claimant's blood pressure is less than ideal and added HCTZ 50 mg daily to his existing drug regimen. (Tr. 210).

On August 3, 2009, Dr. Jose Madrazo treated Claimant in the Valvular Heart Disease Clinic at Washington University School of Medicine for his aortic regurgitation. (Tr. 225). Claimant reported doing quite well since his last visit one year earlier. Claimant reported frequently walking for forty minutes without any shortness of breath or chest discomfort. He denied any lower extremity edema or palpitations. (Tr. 225). Cardiovascular examination showed normal rate and regular rhythm. (Tr. 226). Dr. Madrazo observed no edema of Claimant's extremities. Dr. Madrazo reviewed the June 2007 echocardiogram and noted this showed Claimant has significant left

ventricular hypertrophy, moderate aortic regurgitation, mild aortic stenosis, and a dilated aorta. Dr. Madrazo noted his aortic valve disease is asymptomatic inasmuch as he is able to walk extended distances without any shortness of breath. Dr. Madrazo found Claimant's blood pressure to be fairly well controlled. Dr. Madrazo ordered a transthoracic echocardiogram to evaluate whether or not he has bicuspid aortic valve and the severity of his aortic regurgitation, and a CMP to evaluate his liver enzymes. Dr. Madrazo encouraged Claimant to stop smoking. (Tr. 226).

The August 14, 2009 transthoracic echocardiography a dilated aortic root. (Tr. 230-31).

The September 17, 2009 chest computed tomography showed a aortic root aneurysm involving sinotublar junction with extension to ascending aorta, moderate pericardial effusion, and coronary artery disease. (Tr. 232).

On December 15, 2009, Claimant returned for routine follow-up with Dr. Jai Marathe. (Tr. 239). Claimant reported persistent pain in the right flank area and nasal stuffiness. Examination showed no pedal edema and his blood pressure to be 161/80. (Tr. 239). Dr. Marathe noted his hypertension to be uncontrolled and changed his medication to metoprolol. (Tr. 240). Dr. Marathe discussed with Claimant the possibility of referring him to pain clinic for further evaluation or treatment of gabapentin/lyrica, but Claimant was reluctant. Dr. Marathe noted that Claimant's right renal carcinoma S/P right partial nephrectomy to be stable. (Tr. 240).

In a follow-up treatment on February 2, 2010, Claimant reported palpitations with metoprolol so he discontinued medication and restarted carvedilol with no side effects.(Tr. 244). Examination showed his blood pressure to be 146/67 and no pedal edema. (Tr. 244-45). Dr. Uppaluri noted his hypertension to be adequately controlled. (Tr. 245). Claimant reported his right side pain to be

better but becomes worse with cold weather. Dr. Uppaluri found his S/P partial right nephrectomy to be stable. (Tr. 245).

On March 15, 2010, Dr. Madrazo evaluated Claimant for bicuspid aortic valve and aortic root aneurysm in a follow-up visit. (Tr. 222). Claimant reported doing well from a cardiac point of view and denied any chest pain, chest pressure or discomfort. Dr. Madrazo observed Claimant has no lower extremity edema or palpitation. (Tr. 222). Examination showed his blood pressure to be 143/72. (Tr. 223). Dr. Madrazo reviewed the August 14, 2009 echocardiogram and noted it showed ventricular hypertrophy, a mild to moderate pericardial effusion bicuspid aortic valve with an aortic root and ascending aortic aneurysm and moderate aortic regurgitation. Dr. Madrazo noted his bicuspid aortic valve remains asymptomatic and has moderate aortic regurgitation. Dr. Madrazo noted that due to his aortic aneurysm, he cannot do any heavy lifting or sudden burst of exertion such as sprinting. He can engage in moderate activity/exercise but no high intensity exercise or contact sports. Dr. Madrazo noted his blood pressure to be reasonably controlled and continued his current medication regimen. Dr. Madrazo encouraged Claimant to quit smoking. (Tr. 223).

The April 2, 2010 transthoracic echocardiography a large pericardial effusion. (Tr. 228-29).

In follow-up treatment on April 20, 2010, Claimant reported doing well on carvedilol. (Tr. 246). Examination showed his blood pressure to be 141/71 and no pedal edema. (Tr. 246). Dr. Marathe noted his hypertension to be adequately/better controlled and S/P partial right nephrectomy to be stable. (Tr. 247-48). On July 6, 2010, Claimant reported having right-sided occipital headache and neck rigidity for two to three months since he started different pharmaceutical company pills. (Tr. 249). Examination showed no edema of extremities. (Tr. 249). Claimant was advised to stop smoking. (Tr. 250).

On August 31, 2010, Claimant returned for follow-up blood work treatment at St. Mary's Health Center. (Tr. 272). Examination showed his blood pressure to be 159/76 and no edema of his extremities. (Tr. 273-74). The doctor noted his hypertension to be poorly controlled and ordered blood work. (Tr. 274).

In the December 21, 2010 letter, Dr. Mellas noted his evaluation of Claimant for his chronic kidney disease and noted Claimant claims to be compliant with his medication and reports overall feeling well. (Tr. 283). Examination showed his blood pressure to be 138/68 and extremities free of edema. Dr. Mellas opined "[d]espite the advanced nature of [Claimant's] kidney disease, his renal function is stable during the course of the year, while his blood pressure control is better and overall rather adequate." (Tr. 283).

On January 4, 2011, Claimant returned for follow-up treatment with Dr. Jose at St. Mary's Health Center. (Tr. 268). Claimant reported missing an appointment with BJC Cardiology team, because he ran short of money. (Tr. 269). Examination showed his blood pressure reading to be158/84 and no edema of his extremities. (Tr. 270). Dr. Jose noted his blood pressure reading to be fine at the moment, and his renal panels more or less stable. (Tr. 271). Dr. Jose directed Claimant to be compliant with his medications and follow-up visits. (Tr. 271).

On January 19, 2011, Claimant received treatment in the emergency room at St. Mary's Health Center for an irregular heartbeat and palpitations. (Tr. 264). Claimant reported the palpitations to be a new problem starting three months earlier. (Tr. 264). Claimant reported being an everyday smoker. (Tr. 265). Cardiovascular examination revealed no gallop or friction rub and regular rhythm. (Tr. 266). Musculoskeletal examination showed no edema. The x-ray of his chest showed enlarged cardiac silhouette and mild congestive change in small left effusion. (Tr. 266). The

chest x-ray showed a marked enlargement of cardiac silhouette and slightly increased since prior study in 2008 and small left pleural effusion. (Tr. 277).

Dr. Brian Lindman of the Valvular Heart Disease Clinic evaluated Claimant for aortic regurgitation and aortic dilation on March 14, 2011 on referral by Dr. Uppaluri. (Tr. 255). Claimant reported overall doing fairly well and denied any chest pain, palpitations, or shortness of breath with normal activity including walking a few blocks or upstairs. (Tr. 255). Examination showed no lower-extremity edema or syncope and his blood pressure to be 123/63. (Tr. 255-56). Dr. Lindman diagnosed Claimant with bicuspid aortic valve with moderate aortic regurgitation and aortic aneurysm associated with his bicuspid aortic valve. (Tr. 256). Dr. Lindman also diagnosed him with left ventricular hypertrophy and pericardial effusion and noted this is perhaps due to longstanding hypertension which is now better controlled. Dr. Lindman found Claimant's blood pressure to be currently well controlled on his current medication regimen. Dr. Lindman ordered a BMP and BNP, 2D echocardiogram to evaluate his aortic regurgitation, and a CT of his chest to assess the dimensions of his ascending aorta. (Tr. 256).

The March 25, 2011 CT of his chest to evaluate ascending aortic aneurysm showed no gross interval change in size from the previous study. (Tr. 254).

In follow-up treatment at St. Mary's Health Center on May 3, 2011, Dr. Alan Jose noted that the follow-up treatment notes from Washington University show Claimant's aneurysm to be stable. (Tr. 260). Claimant reported having right sided flank pain a couple times a month. Examination showed right calf to be larger than left calf with swelling in right knee. (Tr. 260). Dr. Jose noted his blood pressure to be 150/77. (Tr. 261). Dr. Jose ordered a doppler venous of his right leg, strict blood pressure control, apply ice over right flank area, and compliance with medications. (Tr. 263).

In the September 20, 2011 letter, Dr. Mellas noted how he evaluated Claimant for chronic kidney disease due to longstanding hypertension having undergone a partial nephrectomy. (Tr. 281). Claimant reported feeling well without any renal related symptoms. Examination showed his blood pressure to be 140/70 and extremities free of edema. Laboratory studies showed stable, if not slightly improved kidney function. Dr. Mellas noted from a renal perspective, Claimant remained remarkable stable and attributed this to his good blood pressure control and its positive affect on long term renal function preservation. (Tr. 281).

## IV. The ALJ's Decision

The ALJ found that Claimant has not engaged in substantial gainful activity since June 2, 2010, the application date. (Tr. 12). The ALJ found that the medical evidence establishes that Claimant has the severe impairments of bicuspid aortic valve with regurgitation, and kidney disease, but no impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 12). The ALJ opined that Claimant has the residual functional capacity to perform light work except that he must have a sit/stand option with the ability to change positions frequently; he can occasionally climb stairs and ramps, but he must never climb ropes, ladders, and scaffolds; he can occasionally stoop, kneel, crouch, and crawl; and he must avoid concentrated exposure to extreme cold, wetness, heat, and humidity. (Tr. 12-13). The ALJ found that Claimant is able to perform past relevant work as a department manager inasmuch as this work does not require the performance of work-related activities produced by his residual functional capacity. (Tr. 15).

Further, in the alternative, the ALJ opined although Claimant is capable of performing past relevant work, there are other jobs existing in the national economy he could also do. (Tr. 16). The

ALJ found Claimant was forty- two years old on the filing date of his application which is defined as a younger individual age 18-49. The ALJ found Claimant has at least a high school education and is able to communicate in English. The ALJ found that there are jobs that exist in significant numbers in the national economy that Claimant can perform such as cashier II. (Tr. 16). The ALJ concluded that Claimant has not been disabled since June 2, 2010, the date his application was filed. (Tr. 17).

## V.    Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental

ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings,

regardless of whether substantial evidence exists to support a different conclusion. <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The claimant's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The claimant's subjective complaints relating to
    exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the
    March 7, 2013claimant's impairments.

6.  The testimony of vocational experts when required which
    is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole." <u>Wiese v. Astrue</u>, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." <u>Wiese</u>, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. <u>Id.</u> The

Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

The thrust of Claimant's argument to this Court seems to be the ALJ's decision is not supported by substantial evidence on the record as a whole. The undersigned will address this issue and will review the ALJ's credibility and RFC determinations to determine whether substantial evidence supports the ALJ's decision.

### A. Credibility Determination

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. § 404.1545; Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians, and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record to support the ALJ's RFC determination. Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04. An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record

cannot stand. Hutsell, 259 F.3d at 712. However, although the ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

1. Credibility Determination

The undersigned will begin with a review of the ALJ's credibility determination. See Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005) (it is clearly established that, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility).

The Eighth Circuit has recognized that, due to the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

A claimant's complaints of pain or symptoms "shall not alone be conclusive evidence of disability ... there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques." Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) (citing 42 U.S.C. § 423(d)(5)(A). An ALJ may not disregard subjective complaints merely because there is no

evidence to support them, but may disbelieve such allegations due to "inherent inconsistencies or other circumstances." Id. (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)); see also Polaski, 739 F.2d at 1322 (although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations, he may discount such complaints if there are inconsistencies in the evidence as a whole). The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The credibility of a claimant's subjective testimony is primarily for the ALJ, not this Court, to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez, 403 F.3d at 957. When an ALJ considers the Polaski factors and discredits a claimant's subjective complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).

In evaluating the claimant's credibility, the ALJ determined that Claimant was not fully credible, in part because his testimony at the hearing was not consistent with what he reported to his treating physicians, with what he had previously reported as his activities of daily living, and with the objective medical evidence.

The ALJ considered the medical record and found the evidence does not support the presence of disabling limitations related to hypertension or frequent urination. In the September 2011 treatment note, Dr. Mellas found Claimant to be without any renal related symptoms. Laboratory studies showed stable or slightly improved kidney function. Dr. Mellas found Claimant to be "remarkable stable" from a renal perspective and attributed his stability to his good blood pressure control and its positive effect on long term renal preservation. Further, the medical records show his hypertension to be well controlled. Conditions which can be controlled by treatment are not

disabling.  See Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009); Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009).  Likewise, the medical evidence does not support a finding that his history of chronic heart problems including bicuspid aortic valve with moderate aortic regurgitation and aortic root aneurysm to be disabling.  On March 15, 2010, Claimant reported doing well from a cardiac point of view and denied any chest pain, chest pressure or discomfort.  Dr. Madrazo observed Claimant has no lower extremity edema or palpitation and found Claimant able to engage in moderate activity/exercise.

The ALJ noted that, contrary to Claimant's alleged disabling kidney problems and status-post right partial nephrectomy for renal carcinoma in 2008, "there is no evidence whatsoever that he experienced any long-term complications of surgery that prevented him from returning to work after recuperating from the operation."  (Tr. 14).  Further, the ALJ found the only current symptom possibly related to the surgery is a right sided flank pain, but Claimant reported this symptom occurs only a couple times a month.  Indeed, when Claimant was offered a referral to a pain clinic for further evaluation and treatment, he declined.  See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities); see also See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.").  As noted by the ALJ, the medical record shows Claimant refused medication for his pain and his treatment for pain has been conservative consisting of ice packs and over-the-counter medications as needed.  Black v. Apfel. 143 F.3d 383, 386 (8th Cir. 1998) (claims of disabling symptoms may be discredited when the record reflects minimal or conservative treatment).

Additionally, subjective complaints of pain may be discredited where a claimant ceases to stop smoking upon a doctor's advice. See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's noncompliance with a treating physician's directions, including failing to take prescription medications, seek treatment, and quit smoking."); Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 1996) (citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding impairments which are controllable or amenable to treatment do not support a finding of disability, and failure to follow a prescribed course of remedial treatment, including cessation of smoking, without good reason is grounds for denying an application of benefits). Therefore, Claimant's failure to cease smoking detracts from his claim that he is unable to engage in substantial gainful employment.

The ALJ also noted how Claimant's hearing testimony regarding his need to lie down three times a day to alleviate his pain and swelling is contradicted by the medical evidence. Although Claimant testified at the hearing that he lies down three times a day for a couple of hours, the undersigned notes that there is no objective medical evidence substantiating Claimant's need to lie down three times a day for a couple of hours. See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day). Indeed, the record shows that there is no objective medical evidence substantiating Claimant's need to lie down three times a day. Further, the record shows Claimant never reported to any doctors his need to lied down a couple times each day. A record, such as that in the matter under consideration, which does not reflect physician imposed restrictions suggests that a claimant's restrictions in daily activities are self-imposed rather than by medical necessity. Zeiler v. Barnhart, 384 F.3d 932, 936

(8th Cir. 2004) ("[T]here is no medical evidence supporting [the claimant's ] that she needs to lie down during the day."); <u>Frederickson v. Barnhart</u>, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily."). Inasmuch as no doctor determined Claimant needed to lie down a couple times a day as a medical necessity, he was not doing so out of medical necessity but out of choice. <u>See</u> <u>Craig v. Chater</u>, 943 F. Supp. 1184, 1188 (W.D. Mo. 1996); <u>Cf.</u> <u>Harris v. Barnhart</u>, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day).

Although Claimant testified at the hearing that he has to use the restroom once an hour due to medication side effects, the undersigned notes that there is no objective medical evidence substantiating this need or that Claimant reported frequent urination as a side effect to any physicians. Indeed, the record shows that there is no objective medical evidence substantiating Claimant's need to use the restroom every hour.

The ALJ also noted that Claimant testified that he was able to assist with the housekeeping including the laundry, ironing, and mopping the floors, and cooking. He further testified that he walks to the grocery store two blocks away when he needs a couple of items. Claimant reported being able to walk extended distances and for forty minutes to physicians during treatment. Indeed, such activities are inconsistent with his allegations of being disabled. <u>See</u> <u>Medhaug v. Astrue</u>, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain); <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1025 (8th Cir. 2007) (some driving, fixing simple meals, and

doing housework noted to be inconsistent with allegations of total disability); Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006) (performing household chores and doing yardwork noted to be inconsistent with allegations of total disability); Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001) (concluding "daily activities [such] as getting up, eating, reading, cleaning the house, making the bed, and doing dishes with the help of [a spouse], making meals, visiting with friends, and occasionally shopping and running errands" are inconsistent with a claimant's subjective complaints of disabling pain). "Inconsistencies between [a claimant's] subjective complaints and her activities diminish her credibility." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005). See also Nguyen v. Chater, 75 F.3d 429, 439-41 (8th Cir. 1996) (holding that a claimant's daily activities, including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits). The Court finds, therefore, that the ALJ properly considered Claimant's daily activities upon choosing to discredit his subjective complaints.

The ALJ noted that Claimant's work history detracts from his credibility regarding the severity of his impairments alleged. A poor work history lessens a Claimant's credibility. Woolf, 3 F.3d at 1214; see also Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (a poor work history "may indicate a lack of motivation to work, rather than a lack of ability."). Further, as noted by the ALJ, Claimant had a history of steady employment through 2002 when he was terminated from his job for reasons unrelated to his health. Claimant testified from 2002 through 2006 he looked for work, he had some temporary jobs and helped his sister fix up her new house. See Frederickson v. Barnhart,

359 F.3d 972, 976-77 (8th Cir. 2004) (holding that the claimant was properly discredited due, in part, to her sporadic work record, reflecting poor earnings and multiple years with no reported earnings, pointing to potential lack of motivation to work); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (low earnings and significant breaks in employment cast doubt on complaints of disabling symptoms). "[A] claimant's financial motivation may contribute to an adverse credibility determination when other factors cast doubt upon the claimant's credibility." Ramirez v. Barnhart, 292 F.3d 576, 581-82 n.4 (8th Cir. 2002).

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by Polaski, he considered Claimant's subjective complaints on the basis of the entire record before him, and set forth inconsistencies detracting from Claimant's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ considered the Polaski factors and discredited Claimant's subjective complaints for good reason, that decision should be upheld.

## B. RFC Determination

As noted above, the ALJ in this case determined that Claimant has the RFC functional capacity to perform light work except that he must have a sit/stand option with the ability to change positions frequently; he can occasionally climb stairs and ramps, but he must never climb ropes, ladders, and scaffolds; he can occasionally stoop, kneel, crouch, and crawl; and he must avoid concentrated exposure to extreme cold, wetness, heat, and humidity. The ALJ found that Claimant can perform his past relevant work as a retail department manager. "Where the claimant has the residual functional capacity to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000) (internal citation omitted). Here, the ALJ properly relied upon the testimony of the vocational expert, and the other evidence of record in determining that Claimant retained the ability to work as a retail department manager, and this finding is substantially supported by the record as a whole. See Smallwood v. Chater, 65 F.3d 87, 89 (8th Cir. 1995) (vocational expert can properly offer testimony as to whether claimant can work after taking into account medical limitations); Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (ALJ may properly rely on claimant's own description of past duties when formulating RFC and determining

exertional demands of past relevant work). Because Claimant retained the RFC to perform his past relevant work as a retail department manager, he was not disabled. Substantial evidence in the record as a whole supports the ALJ's RFC determination so the undersigned find the decision of the Commissioner should be affirmed.

Further, in the alternative, the ALJ opined although Claimant is capable of performing past relevant work, there are other jobs existing in the national economy he could also do such as cashier II. Substantial evidence supports this decision.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time

for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).


/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE


Dated this  5th  day of February, 2014.